UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DOYLE TAWFALL, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 4:09 CV 727 DDN ) ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) |
| Defendant. | ) |

**MEMORANDUM**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Doyle Tawfall for disability insurance benefits under Title II of the Social Security Act, and supplemental security income under Title XVI of the Act, 42 U.S.C. § 401, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 14.) For the reasons set forth below, the ALJ's decision is affirmed.

**I. BACKGROUND**

Plaintiff Doyle Tawfall was born on March 29, 1962. (Tr. 39.) He is 5 feet 9 inches tall and weighs between 184 and 214 pounds. (Tr. 107, 220.) He completed high school and has not received any special job and trade training. (Tr. 59.) He has worked as an assembler at an automotive plant, and periodically in construction and agriculture. (Tr. 43-47, 61.) Tawfall's last significant employment was in 1997. (Tr. 49.)

On January 5, 2005, plaintiff applied for disability insurance benefits, alleging he became disabled on December 1, 2000, on account of short term memory loss, depression, and arthritis. (Tr. 54-55.) He received a notice of disapproved claims on April 7, 2005. (Tr. 13.) After a hearing on November 7, 2006, the ALJ denied benefits on September 14, 2007. (Tr. 22.) On March 11, 2009, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 5.)

## II.  MEDICAL HISTORY

From May 2001 through December 2004, Tawfall saw a number of doctors at Corning Area Healthcare, Inc. (hereafter "Corning"); the court will refer to Corning generally, rather than to individual treating physicians.

Tawfall first visited Corning on May 31, 2001. He complained of tiredness and nervousness accompanied by tightness in his upper chest. Noting hypertension, Corning prescribed Norvasc and continued Tawfall's prescription for Enalapril, but discontinued one for Hyrdalazine.[1] (Tr. 97.)

On June 14, 2001, Tawfall saw Corning again. Corning found that Tawfall felt better, and his hypertension had improved. (Tr. 98.)

Tawfall saw Corning twice more in July of 2001. Corning increased Tawfall's dosage of Norvasc, but his hypertension persisted, ranging from "normal to borderline high." (Tr. 98-99.)

On August 23, 2001, Tawfall returned to Corning and complained of fatigue, stress, moodiness, insomnia, and various bodily pains. Tawfall's hypertension remained low. Corning diagnosed depression and prescribed Zoloft.[2] (Tr. 99.)

On August 31, 2001, Tawfall reported improved energy levels, and decreased moodiness and insomnia as a result of his treatment. (Tr. 100.)

On September 26, 2001, Corning found that Tawfall had lost ground on his depression and increased his antidepressant dosage. (Tr. 100.)

On October 29, 2001, Tawfall complained of continuing insomnia and Corning prescribed an additional antidepressant, Trazodone.[3] (Tr. 101.)

Between November 2001 and July 2002, Corning found that Tawfall was feeling well, his depression was well controlled, and his insomnia was much improved. A prescription for Dyazide was added on November 29, 2001.[4] (Tr. 102-03.)

On July 29, 2002, Corning noted that Tawfall was generally sleeping

---

[1] Norvasc is used to treat high blood pressure; Enalapril is used to treat high blood pressure; Hydralazine is used to treat high blood pressure. WebMD, http://www.webmd.com/drugs (Last visited July 31, 2010.)

[2] Zoloft is used to treat depression. (Id.)

[3] Trazodone is used to treat depression. (Id.)

[4] Hydrochlorothiazide, or Dyazide, is used to treat high blood pressure. (Id.)

well and that his depression was fairly well controlled, but that he still had problems with moodiness and fatigue. Corning increased Tawfall's antidepressant prescription and recommended aspirin daily. (Tr. 104.)

On December 23, 2002, Tawfall complained of increased stress, low energy levels, and depression as a result of his father's death. Corning continued all medications. (Tr. 106.)

On January 24, 2003, Tawfall reported right knee and right shoulder pain. Corning diagnosed arthritis and recommended Aleve. (Tr. 107.)

On April 24, 2003, Tawfall reported that his depression and moodiness were better, but that he still suffered from some insomnia. His arthritic pains were unimproved. (Tr. 107.)

On April 29, 2003, Corning began treating Tawfall for diabetes. Corning prescribed Glucophage, recommended a glucose monitor and an educational course on diabetes, which Tawfall completed on May 1, 2003.[5] (Tr. 108.)

On May 20, 2003, Tawfall reported that he was feeling well and that his blood sugar had improved with medication. He complained of neck pain, and reported a history of three neck injuries. Corning diagnosed cervical arthritis in the neck and diabetes mellitus. (Tr. 108.)

On July 1, 2003, Tawfall reported that he was feeling well, but still suffering from neck and shoulder pain, as well as headaches. (Tr. 110.)

Between July 2003 and July 2004, Tawfall visited Corning numerous times, complaining of fatigue, insomnia, stress and other ailments. Corning recommended that Tawfall get more exercise, and substituted Glucotrol for Glucophage, but otherwise continued all of Tawfall's medications.[6] (Tr. 110-14.)

On July 1, 2004, Tawfall visited the emergency room at Arkansas Methodist Medical Center for chest discomfort. Tawfall complained of other ailments including depression, headache, and fatigue. Hospital staff noted that Tawfall could move his extremities well, was diabetic, but had not eaten well for several days. After an x-ray showed no abnormalities, Tawfall was treated with nitroglycerin and antibiotics and released. (Tr. 137-39.)

On October 22, 2004, Corning diagnosed rheumatoid arthritis in

---

[5] Glucophage is used to control high blood sugar. (Id.)
[6] Glucotrol is used to control high blood sugar. (Id.)

-3-

Tawfall's right knee and prescribed Bextra.[7]  (Tr. 117.)

On January 18, 2005, Tawfall visited Great Mines Health Center to establish care.  Tawfall reported occasional chest pain, and memory problems as a result of a 1992 motor vehicle accident involving head trauma.  Michael Singh, RN, BC, FNP, noted that Tawfall's medical history included: arthritic knee pain since 1975, chest pain and hypertension since 1999, depression and insomnia since 2001, and diabetes since 2002.  Singh noted that Tawfall was alert, oriented, and in no acute distress.  Singh diagnosed Tawfall with diabetes milletus, lower back pain, chest pain, hypertension, hyperlipidemia, insomnia, and bilateral knee arthritis.  Singh changed Tawfall's arthritis medication, but otherwise continued all of Tawfall's medications.  (Tr. 145-46.)

On January 20, 2005, Tawfall completed a function report in preparation for this claim.  In a typical day, Tawfall would alternately sit, stand, or walk around while listening to the radio.  He and his wife took care of each other, and helped each other around the house.  Tawfall helped clean, do laundry, and mow the grass, but needed assistance and had to take breaks.  Tawfall complained that his knee pain prevented him from being active, that he had low energy, and had trouble sleeping and remembering things.  Tawfall noted no problems with personal care, but that he sometimes forgot to take his medications.  He could cook anything, but needed to be reminded to watch the stove.  Tawfall would either walk, drive, or ride in a car when he left the house, and would do so alone, but could not drive for any long periods of time because of stiffness and pain.  Tawfall went grocery shopping for an hour once a week, and was able to manage his own finances, but sometimes forgot to pay a bill.  Tawfall used to play sports, fish, hunt and watch television, but his hobbies were limited to fishing, socializing, attending church, and watching television.  Tawfall noted difficulties with a number of activities as a result of knee stiffness and an inability to concentrate and remember things.  Tawfall used a cane to assist his walking, though it was not prescribed by a doctor.  Tawfall noted no difficulties using his hands.  (Tr. 68-75.)

On February 1, 2005, Tawfall was evaluated by Licensed Psychologist Kenneth G. Mayfield.  Dr. Mayfield noted that Tawfall had no history of formal psychiatric evaluation or treatment, but had prescriptions for

---

[7] Bextra is used to treat pain and loss of function.  (<u>Id.</u>)

depression and insomnia. Dr. Mayfield noted that Tawfall's described lifestyle was largely sedentary and solitary, with no avocational pursuits. Mayfield noted that Tawfall maintained good eye contact, was cleanly attired, oriented, responsive, cooperative, coherent and logical. Mayfield also noted that Tawfall was anxious and concerned about various aspects of his life, reported sleeping problems, hearing voices, and having suicidal thoughts. (Tr. 150.)

Dr. Mayfield concluded that Tawfall was not actively delusional, he was presently oriented, able to communicate effectively, and his remote memory appeared grossly intact. However, Mayfield noted that Tawfall's concentration was impaired, his recall of recent activities was limited, he was depressed, and his emotional balance appeared fragile. Mayfield diagnosed severe major depressive disorder with psychotic features, and assigned Tawfall a GAF of 50.[8] (Tr. 150-51.)

Dr. Mayfield found that despite considerable social isolation and an impaired ability to cope with stress and work pressures, Tawfall's ability to relate to others was borderline intact and he was able to attend to basic personal and financial needs and understand verbal directions. (Tr. 151.)

On March 4, 2005, Tawfall saw Michael Singh, R.N., and complained of continuing chest pains. Dr. Singh noted that the patient was alert, in no acute distress, that he was tolerating his medications well, his thought process was logical, and his mood was good. Dr. Singh also noted normal ranges of motion in Tawfall's extremities, normal knee reflexes, no edema, and mild tenderness in his lower spine. As Tawfall had not been monitoring his glucose levels, Singh gave him instructions to do so, to stop smoking and to start exercising. Dr. Singh continued all medications in effect. (Tr. 204-05.)

On March 7, 2005, Arthur P. Greenberg, M.D., performed an internal medicine examination of Tawfall. Tawfall complained chiefly of knee

---

[8] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. A score from 61 to 70 represents mild symptoms (such as depressed mood and mild insomnia), or some difficulty in social, occupational, or school functioning (such as occasional truancy, or theft within the household), but the individual generally functions pretty well and has some meaningful interpersonal relationships. Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

pain and memory loss; he stated that he forgets to take his medications and leaves food cooking on the stove and that his knee pain is particularly bad when he is walking or bending his knee. (Tr. 152-53.)

Dr. Greenberg noted that Tawfall walked with a normal gait, had good coordination, and appeared comfortable sitting or lying down. He also noted full range of motion in Tawfall's wrists and hands, and good upper dexterity strength. Dr. Greenberg noted abnormalities in Tawfall's reflexes, that his poor balance made it difficult for him to walk on his heels or toes, and that he could not squat. (Tr. 153-54.)

Dr. Greenberg diagnosed diabetes milletus and hypertension; he opined that Tawfall's reflexive and sensory abnormalities were consistent with radiculopathy, though he found no direct evidence of it, nor would he rule out diabetic neuropathy as a cause.[9] Dr. Greenberg concluded that Tawfall should avoid squatting and that his ability to perform work-related activities such as bending, stooping, lifting, walking, carrying, and pushing and pulling heavy objects appeared mildly to moderately impaired. (Tr. 155.)

Regarding memory loss, Dr. Greenberg noted that Tawfall had normal intellectual functioning and that his memory of recent and remote medical events was good. Dr. Greenberg found no obvious memory deficits, but noted that he was not able to thoroughly test Tawfall's specific complaints of memory loss. (Tr. 153-55.)

On March 16, 2005, Tawfall visited Manzoor A. Tariq, M.D., a cardiologist. Dr. Tariq diagnosed anginal-type chest pain, coronary artery disease, and noted tobacco abuse. A subsequent echocardiogram showed that Tawfall's systolic functioning was normal. (Tr. 224-27.)

Tawfall saw Michael Singh several more times in March and April, 2005. Singh noted that Tawfall was sleeping 7 to 9 hours per night, and was not having chest pain or headaches. However his arthritic symptoms were persisting. Tawfall reported back pain because he had run out of his medication, and feeling slightly depressed. (Tr. 207-09.)

On July 1, 2005, Tawfall saw Dr. Singh for a checkup after three weeks of physical therapy. Tawfall's mood was good and the extension and flexion of his right knee was improved. Tawfall's knee pain persisted, however, and would occasionally wake him up in the night.

---

[9] Radiculopathy is a disease of the spinal nerve roots; neuropathy is any disorder affecting any segment of the nervous system. Stedman's Medical Dictionary, 1048, 1308.

Dr. Singh recommended two additional weeks of physical therapy and continued Tawfall's medications. Singh also prescribed an additional anti-inflammatory.[10] (Tr. 211.)

On July 11, 2005, Tawfall saw Singh and reported intermittent episodes of forgetfulness. (Tr. 212.)

On September 16, 2005, Tawfall reported to Dr. Singh that he had had headaches for years but that in the last few months they had been getting worse. Tawfall reported that his headaches lasted for a few hours, were affected by light and noise, and he sometimes suffered from headaches as much as three times per week. Singh ordered a computed tomography (CT) scan, which showed no abnormalities. (Tr. 216, 229.)

On October 24, 2005, Tawfall saw Dr. Singh and reported stable blood pressure, no chest pain, and that he had been sleeping and feeling well. Tawfall did, however, complain of occasional episodes of migraines two to three times per week that lasted an hour or more, sometimes lasting more than a day. Singh prescribed additional pain-relieving and anti-inflammatory medications along with Tawfall's other medications.[11] Singh noted that Tawfall saw Dr. Pearson for back and muscle pain. Pearson recommended a long-term program of conservative and supportive medical measures, including rehabilitation and anti-inflammatory medications, but concluded that no surgery was required. (Tr. 215.)

On October 31, 2005, Tawfall again complained to Singh of intermittent headaches. Tawfall stated that he could not afford the medication he had been prescribed for his migraines. He also complained of recent numbness and decreased sensation and strength in his hands that sometimes cause him to drop objects. Tawfall did state, however, that medicine had been very effective in treating his joint pains. Singh diagnosed bilateral upper extremity neuropathy, prescribed Maxalt, and ordered further testing.[12] (Tr. 216.)

On November 18, 2005, after a nerve conduction study, Singh confirmed bilateral upper extremity neuropathy, diabetic in origin. Singh noted persistent mild hand grasp weakness, but no edema or range

---

[10] Daypro is an anti-inflammatory drug used to reduce pain, swelling, and joint stiffness from arthritis. WebMD, http://www.webmd.com/drugs. (Last visited July 31, 2010.)
[11] Toradol is used for the short-term treatment of moderate to severe pain. (Id.)
[12] Maxalt is used to treat headaches, pain, and migraines. (Id.)

of motion limitations.  Singh recommended strengthening exercises and that Tawfall continue other medications.  (Tr. 217.)

On January 11, 2006, Tawfall saw Singh and denied having any chest pains or headaches.  He also reported that this blood sugars had been well controlled and his blood pressure stable.  Tawfall complained of continuing lower back and right hip pain, which was relieved with medication.  Singh found normal flexion, extension and rotation in Tawfall's knees, hips, and shoulders, but noted that right leg raises produced mild lower back pain.  Singh ordered X-rays.  (Tr. 218.)

On January 13, 2006, X-rays confirmed mild to moderate mid-back arthritis but showed no abnormalities in Tawfall's hips.  (Tr. 324.)

On May 18, 2006, Tawfall saw Singh, again complaining of migraines and irritability after his anti-depressant dosage was decreased.  Tawfall also reported that he had lost his medical insurance and could no longer afford his prescriptions.  Singh changed many of Tawfall's prescriptions to accommodate his financial situation and recommended exercise three to four times a week.  (Tr. 222.)

On February 10, 2007, Tawfall saw Michael T. Armour, Ph.D., for a consultative psychological examination.  Dr. Armour concluded through testing that Tawfall's credibility was borderline.  He opined that Tawfall was preoccupied by his physical problems and that some of his claims appeared exaggerated.  (Tr. 240.)

Dr. Armour diagnosed Tawfall with major depressive disorder, a pain disorder, and noted a history of cannabis and alcohol abuse.  Dr. Armour noted that Tawfall's medical history included diabetes milletus, hypertension, and arthritis, and assigned a GAF score of 50-55.  (Tr. 242.)

Dr. Armour concluded that, at the time of examination: (1) Tawfall's ability to understand and recall instructions was mildly to moderately impaired, (2) his ability to understand information was intact, (3) his ability to concentrate on tasks was mildly to moderately impaired, (4) his ability to interact socially and adapt to his environment was mildly to moderately impaired, and (5) that he was not suicidal.  Dr. Armour stated that Tawfall's memory was difficult to assess but noted that he was able to give an overall detailed social history, remember certain dates, and remember objects presented to him, but noted that additional testing might be necessary.  (Tr. 241-43.)

**Testimony at the Hearing**

On November 7, 2006, Tawfall testified before the ALJ. He last worked in construction, and though he could not remember when he last worked, he believed it was over three years ago. (Tr. 266.) Tawfall lost Medicaid coverage some time in 2006. (Tr. 267.)

Tawfall suffered from diabetes, but his blood sugars were controlled by medicine. (Id.) Tawfall stated that his hands caused him pain, though it was not constant, and they sometimes shook or fell asleep; he had problems picking up heavy objects, and would occasionally drop small objects involuntarily. (Tr. 268.) He could lift a gallon of milk with one hand, but sometimes required two hands, and could lift as much as a ten-pound bag of sugar, though he admitted that he does not attempt to lift very much. (Tr. 276-77.)

Tawfall suffered from arthritic pains: a dull, nagging pain that was constant in his lower back, and a less frequent, stabbing pain in his upper back. (Tr. 269-70.) Tawfall could not afford the medication he previously took for his arthritic pains, and stated that the replacement was not as effective. (Tr. 269.) He also stated that the medication made him lightheaded and dizzy. (Tr. 271.)

Tawfall stated that he suffered from migraines at least once a week, and that they sometimes lasted more than a day. (Tr. 269.) He could no longer afford his migraine medicine. (Tr. 270.)

Tawfall testified about his daily activities. He lived in a trailer with his wife. (Tr. 272.) He could dress himself, but sometimes needed help with his shoes when his back hurt. (Id.) Tawfall reported that he could vacuum, cook, and wash dishes, but often had to take breaks; he did laundry but could not pick up a full basket of clothes. (Tr. 273.) Tawfall and his wife went shopping together about once a month, sometimes using electronic wheelchairs for assistance. He could drive, but reported back and hand pain as a result. (Tr. 274.) He could walk about a block before he had to take a break, could stand for ten to fifteen minutes before he needed to sit down, and could not sit for an hour without changing positions. (Tr. 275-76.) Tawfall also testified that he would lay down for about an hour three times a day to help with his back pain. (Tr. 277.)

Tawfall also testified about his mental health. Tawfall had trouble focusing on books and movies, lost interest in them rapidly, and could not remember most of what he saw or read. (Tr. 278.) He had

trouble sleeping, but got about six hours of sleep when he took his medication. (Tr. 278-79.) He no longer engaged in social activities or visited with friends and had been diagnosed with depression. (Tr. 277-80.)

### III. DECISION OF THE ALJ

The ALJ followed the required regulatory five-step procedure in reaching a decision. At Step One, the ALJ determined that Tawfall had not engaged in substantial gainful activity since December 1, 2000, the alleged disability onset date. At Step Two, the ALJ found that Tawfall suffered from the following severe impairments: diabetes mellitus with neuropathy, hypertension, internal derangement of the right knee, major depressive disorder and pain disorder associated with both psychological factors and a general medical condition.

The ALJ also found that Tawfall suffered from migraines as well as back, shoulder, and neck pains, but concluded that these impairments were not severe. In concluding that these impairments were non-severe, the ALJ found Tawfall had: (1) moderate restrictions in his daily living, (2) mild difficulties with social functioning, and (3) moderate difficulties with maintaining concentration, persistence, and pace. The ALJ also determined that Tawfall had not suffered any episodes of decompensation. At Step Three, the ALJ found that Tawfall's impairments did not meet a listed limitation. (Tr. 16-18.)

At Step Four, the ALJ found that Tawfall had the residual functional capacity (RFC) to perform his past relevant work as an assembler. More specifically, the ALJ found that Tawfall had the ability to perform a range of light work, including the capacity to lift and carry twenty pounds occasionally and ten pounds more frequently, and to sit, stand and walk for six hours.

The ALJ did note, however, that Tawfall needed to avoid even moderate exposure to occupational hazards. Despite mild limitations, the ALJ found that Tawfall could function well for understanding, remembering and carrying out short, simple instructions and for interacting appropriately with the public, supervisors and co-workers. Despite moderate limitations, the ALJ found that Tawfall could function satisfactorily for understanding, remembering, and carrying out detailed instructions, for making judgments on simple work-related decisions; and for responding appropriately to work pressures in a usual work setting

and to changes in a routine work-setting.

In reaching his conclusions at Step Four, the ALJ determined that, based on the evidence of record, Tawfall's testimony regarding the intensity, persistence, and limiting effects of his symptoms are not entirely credible. The ALJ found that Tawfall was capable of performing his past relevant work as an assembler. Consequently, the ALJ found Tawfall not disabled. (Tr. 18-22.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's

-11-

analysis proceeds to steps four and five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. Id. The claimant bears the burden of demonstrating he is no longer able to return to his past relevant work. Id. If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

## V. DISCUSSION

Tawfall argues the ALJ's decision is not supported by substantial evidence. Tawfall makes four arguments regarding the ALJ's RFC assessment: (1) the ALJ failed to properly assess Tawfall's credibility, (2) the ALJ's assessment is unsupported by medical evidence; (3) the ALJ failed to account for Tawfall's neuropathy; (4) the ALJ relied on factual errors in assessing Tawfall's migraines and memory issues. (Doc. 17.)

### Credibility and Narrative Discussion

Tawfall argues that the ALJ's RFC assessment is not supported by the record. Specifically, Tawfall argues that the ALJ did not properly assess his credibility and that the ALJ's narrative discussion was not sufficiently supported by specific medical evidence. (Doc. 17 at 14, 17-18.) The defendant argues that the ALJ's conclusions were based on substantial evidence and Tawfall's claims are without merit. (Doc. 26 at 22-23.)

The RFC is a function-by-function assessment of an individual's ability to do work-related activities based upon the relevant evidence. Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007). The ALJ must determine the claimant's RFC based on all of the relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of his limitations. Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001).

The ALJ must take into consideration the claimant's subjective complaints even if the medical evidence does not fully support them. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). In addition to objective medical evidence, the ALJ must take into account the Polaski factors, which include: (1) the claimant's daily activities, (2) the duration, frequency and intensity of pain, (3) precipitating and

aggravating factors, (4) dosage, effectiveness and side effects of medication, and (5) any functional restrictions. Casey, 503 F.3d at 695. However, the ALJ's decision need not discuss the relation of every Polaski factor to the claimant's credibility. Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004).

The credibility of a claimant's subjective testimony is primarily a decision for the ALJ, not the courts. Pearsall, 274 F.3d at 1218. While an ALJ may not disregard subjective complaints solely because they are not fully supported by medical evidence, the ALJ may discount such complaints if they are inconsistent with objective medical findings. Ramirez v. Bernhart, 292 F.3d 576, 582 (8th Cir. 2002). Deference is given to the ALJ's credibility determinations so long as they are supported by good reasons and substantial evidence. Vester v. Bernhart, 416 F.3d 886, 889 (8th Cir. 2005).

Tawfall argues that the ALJ's credibility analysis was inadequate under the standards set forth above. We disagree. The ALJ held that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but [] the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible." (Tr. 20.) The ALJ then provided a summary of medical evidence that established numerous inconsistencies with Tawfall's testimony. Multiple reports indicated normal sensory and motor functions in Tawfall's extremities. (Tr. 20-21.) Tawfall appeared comfortable in both the sitting and supine positions. (Id.) Tawfall's depression, knee pain, and diabetes could be adequately controlled by medication, and his diabetes had resulted in no significant abnormalities. (Id.)

During his hearing before the ALJ, Tawfall's testimony differed widely from the record: Tawfall alleged that the severity of his hand problems, back pains, and mental deficiencies were disabling to an extent beyond that which the record, as summarized above, suggested. Furthermore, an impairment that can be controlled by medication or treatment cannot be considered disabling. Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004). The record provides substantial evidence to confirm the ALJ's conclusion: the medical evidence and Tawfall's daily activities show that, while Tawfall suffered from depression, diabetes, and other ailments, they were not disabling to the extent claimed by Tawfall's testimony.

Tawfall further argues that the ALJ erred by failing to discuss the dosage, effectiveness, and side effects of his medication. (Doc. 17 at 17.) However, the effectiveness of the medication was one of the factors that the ALJ weighed against Tawfall's credibility. While the ALJ did not discuss Tawfall's testimony regarding the side effects of his medication, Tawfall failed to list any side effects in his own disability report. (Tr. 58.) Moreover, as stated above, the ALJ need not discuss how each of the Polaski factors relates to a credibility determination. Tucker, 363 F.3d at 783.

Having concluded that Tawfall's subjective complaints were not entirely credibly, the ALJ determined Tawfall's RFC as follows:

> [T]he claimant has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently. The claimant can sit, stand, and walk for six hours. He must avoid even moderate exposure to occupational hazards such as open moving machinery and unprotected heights. The claimant has some mild limitations but can generally function well for understanding, remembering, and carrying out short, simple instructions; and for interacting appropriately with the public, supervisors, and co-workers. The claimant has moderate limitation but is still able to function satisfactorily for understanding, remembering, and carrying out detailed instructions; for making judgments on simple work-related decisions; and for responding appropriately to work pressures in a usual work setting and to changes in a routine work setting.

(Tr. at 18.) Tawfall argues that the ALJ did not point to any specific evidence supporting these limitations, and failed to provide a narrative discussion of RFC. (Doc. 17 at 13-14.)

Tawfall argues that the ALJ failed to provide a narrative discussion. Social Security Ruling 96-8p requires that an "RFC assessment include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations.)" Social Security Ruling 96-8p, 7 (1996). But this requirement does not dictate how an ALJ's decision must be written; the ALJ need not provide a narrative discussion immediately following each statement of an individual limitation in the RFC. Moreover, the ALJ is not required to make explicit findings for every aspect of the RFC. Depover v. Barnhart, 349 F.3d 563, 567 (8th Cir. 2003).

The ALJ provided a narrative discussion of Tawfall's limitations, as well as a detailed analysis of the record at both Steps Three and

-14-

Four. (Tr. 16-21.) Tawfall points to a Seventh Circuit case to establish that the omission of a narrative discussion of RFC is sufficient to warrant reversal. Briscoe ex rel. Taylor 425 F.3d 345, 352 (7th Cir. 2005). But Briscoe involved an ALJ whose conclusions were unsupported by the record, and who failed to address the claimant's testimony. Id. at 352-53.

The ALJ discussed both the objective evidence and subjective testimony, and made his determination based on a full examination of the record. It is the claimant's burden to prove his own RFC. Pearsall, 274 F.3d at 1217. The ALJ found credible evidence that Tawfall was capable of taking care of himself, sustaining concentration, following directions, remembering his medical history, sitting comfortably, and performing a number of other daily activities. The ALJ's credibility assessment and the sufficiency of his narrative discussion are supported by the record.

### Neuropathy

Tawfall further argues that the ALJ erred by failing to include limitations arising from his neuropathy in the RFC assessment. The defendant argues that the record shows that the plaintiff's neuropathy did not cause any continuing functional limitations and that the ALJ's RFC determination is supported by substantial evidence.

Although required to develop the record fully and fairly, the ALJ need not discuss every piece of evidence submitted; nor does a failure to cite specific evidence indicate that the evidence was not considered. Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010). Thus, the ALJ's failure to include any limitations arising from neuropathy is not necessarily reversible error. Moreover, the ALJ did in fact discuss Tawfall's neuropathy twice in his opinion. Diabetes milletus with neuropathy is noted as one of Tawfall's severe impairments at Step Three; the ALJ's RFC assessment also notes that in November, 2005, diagnostic studies confirmed that Tawfall suffered from upper extremity neuropathy. (Tr. 15, 21.) The ALJ nevertheless found that Tawfall's allegations regarding his neuropathy were not credible to the extent that they prevented him from performing his past work as an assembler. (Tr. 20.) Based on his credibility determination, the ALJ properly discounted Tawfall's subjective testimony about the extent of his impairments as a result of neuropathy. The failure to include

limitations arising from discounted subjective testimony of a plaintiff's ailments is not reversible error.

### **Factual Errors**

Finally, Tawfall argues that the ALJ relied on factual errors regarding the medical evidence about Tawfall's migraine and memory issues.

The first disputed statement made by the ALJ reads:

> [Dr. Greenberg] noted on March, 7, 2005, that the claimant's intellectual functioning seemed normal. Dr. Greenberg noted that the claimant's memory for medical events was good. Dr. Greenberg noted no obvious memory deficits.

(Tr. 17.) Dr. Greenberg's evaluation, in relevant part, reads:

> Intellectual functioning seems normal throughout examination . . . . Recent and remote memory for medical events is good. Affect during examination is normal. No obvious memory deficits elicited during examination but assessment of the memory issues described by the claimant were not able to be thoroughly tested during examination.

(Tr. 153.) Tawfall objects to the ALJ's reliance on this statement despite the limited nature of the testing.

This objection, however, raises no questions as to the factual validity of the ALJ's statement. While it is true that Dr. Greenberg noted he could not thoroughly test Tawfall's memory, his report supports the ALJ's statement. Tawfall's argument of factual error is without merit.

The second disputed statement reads:

> [Tawfall] testified that he got [migraines] at least once a week. He testified that sometimes a migraine lasted an entire day and on into the next day. The undersigned notes that the claimant did not report to a physician that he had such frequent and severe migraines.

(Tr. 16.)

On October 24, 2005, Tawfall complained to Michael Singh about his migraines. The report states that Tawfall

> has occasional episodes of migraines 2-3x/week . . . . He states that the pain lasts sometimes for an hour or more and can sometimes last for more than one day.

(Tr. 215.) Tawfall bases his claim of factual error on this report. (Doc. 17 at 16.)

While this report indicates that Tawfall was suffering from

-16-

migraines, the ALJ cited to the same examination in his discussion. (Tr. 16.) As both Tawfall and the ALJ have cited the same report, plaintiff's argument depends on the use of the word "occasional." The ALJ interpreted the report to mean that Tawfall occasionally had episodes of migraines, and during such episodes, he suffered two to three migraines a week. Tawfall's argument is that he suffered two or three migraines each week, continuously and not just episodically.

Either interpretation is reasonably possible. One report indicates that Tawfall suffered from "intermittent" headaches; another stated that Tawfall "sometimes gets [migraines] 3x/week." (Tr. 213, 216.) The ALJ's finding in this regard is supported by the record and does not amount to a factual error.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

    /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on September 21, 2010.